STATE OF TENNESSEE *ex relatione*, etc., *vs.* MAYOR AND CITY COUNCIL OF NASHVILLE.

## April Term, 1877.

EDUCATIONAL CHARITY—CONSTRUCTION OF DEED—EVIDENCE ALIUNDE.—In the case of an educational charity, if the terms of the deed be clear, no evidence *aliunde* is admissible, and evidence is only admissible in any case to enable the court to construe the terms of the deed.

CASE IN JUDGMENT.—In 1851 land was given to a municipal corporation, "in trust, to and for the use of a free public school for South Nashville forever." *Held*, that these terms were clear and unambiguous, having precisely the same meaning now as in 1851, and that extrinsic evidence was inadmissible to show that the gift was intended to be limited to a class; for example, to white children to the exclusion of colored children.

*James Trimble*, for complainant.
*McAllister*, for city.

THE CHANCELLOR:—On demurrer. The relator, John Trimble, on the 10th of October, 1851, by deed of that date, conveyed a lot of land, within the present limits of the city of Nashville, to the mayor and aldermen of South Nashville, a municipal corporation covering said land, since consolidated with and merged in the defendant, the Mayor and city council of Nashville, a municipal corporation embracing the territory of both cities. The conveyance was a gift by the grantor, in compliance with a previous agreement on his part "to aid in establishing a free public school in South Nashville." The *habendum* of the deed was: "To have and to hold said lot to said mayor and aldermen of South Nashville, and their successors in office, forever, in trust nevertheless, to and for the use of a free public school for South Nashville forever, and for no other use or purpose whatever; and, when the same shall fail to be used for such purpose, the same shall revert to me and my heirs. It is also a part of this deed, that there may be erected on said lot a church, to be open for all denominations of christians, if the people of South Nashville shall, at any future time, so determine." A school building had, previous to the date of the deed, been erected on the lot by the voluntary

contributions of the relators and others, which, the deed recites, was then in use "as a free public school-house." At that time the scholastic population, for whose benefit the trust was created, consisted wholly of the white race. The building was used as a school exclusively for white children from the year 1851 to the year 1872, except the period during the civil war. During the year 1872 the defendant established a "colored school" in the building, and such a school has since been carried on therein. The bill says: "Although the words and express letter of the deed may not literally read, confine this school to the white population of South Nashville, yet such was the clear intention of the donor, as is manifest from the statement of facts herein contained—as strong as the letter itself, if not stronger—and, if necessary, the court will, they are advised, correct the same, and declare the trusts of the deed." The bill was filed on the 30th of July, 1874, and asks that the deed be construed, and, if necessary, be cured of the mistake by omission, that the trust be declared according to the intention of its establishment and endowment, and for such other relief as the complainant, and the founders, and the people of South Nashville, are entitled to.

The bill does not state that the deed was drafted otherwise than was intended by the grantor, or that by mistake, or otherwise, anything was inserted which ought not to have been inserted, or anything omitted which was intended to be inserted. No ground is, therefore, laid in the bill for changing its wording in any respect. The learned counsel for the complainant very properly concedes, therefore, that the demurrer fairly raises the question whether the terms used in the deed creating the trust, and defining its object, show the alleged intention of the donor, and the further question whether, upon those terms and the allegations of the bill, evidence *aliunde* of the deed is admissible to show the alleged intention of the donor.

The intention of the donor, it is alleged in the bill, was to confine the school to the white population of South Nash-

-ville. The bill fairly concedes that " the words and express letter of the deed may not," when literally read, thus con- fine the school. The trust is, " to and for the use of a free public school for South Nashville forever." Read literally, it is clear there is no limitation whatever on the gift, either as to the number of scholars, their ages, sex, race, or former condition of servitude. Provided the lot is used for a free public school, the discretion of the trustee as to details is unlimited.

The position assumed, and ably argued by the complain- ant's counsel, is that extrinsic evidence is admissible to show the meaning of the words used in the deed, the cases relat- ing to ecclesiastical charities being relied on, and especially the great case of *Lady Hewley's Charities,* reported in full under the name of *Shore* v. *Wilson,* in 9 Cl. & Fin. 355. In such charities there can be no doubt that evidence has been admitted, with more or less freedom, to explain the terms in which the gift was made, the limitations as to the character of such evidence being left somewhat vague and indefinite. But on two points all the judges are agreed, even in that class of cases—first, that, if the terms of the deed be clear, no evidence *aliunde* is admissible ; and, secondly, that the evidence in any case is only admissible to enable the court to construe the terms of the deed. These limitations are strikingly conspicious in *Lady Hewley's Case.*

The opinion of Mr. Justice Patterson, and Baron Alderson, called in to assist Lord Lyndhurst, says that the principles which control it are fully laid down in *Attorney General* v. *Pearson,* 3 Mer. 353, and may be thus shortly expressed : " The will of the founder is to be observed. Then, how is the will of the founder to be ascertained ? If it be expressed clearly in the instrument of foundation, there can be no difficulty. If expressed in doubtful or general words, recourse must be had to extrinsic circumstances, such as the known opinions of the founder, the existing state of the law, the contemporaneous usage, or the like." 9 Cl. & Fin. 383. "I agree," says Lord Lyndhurst, "entirely in the

principle stated by the learned judges, upon which this case must be decided. In every case of charity, whether the object of the charity be directed to religious purposes or to purposes purely civil, it is the duty of the court to give effect to the intent of the founder, provided this can be done without infringing any known rule of law. It is a principle that is uniformly acted upon in courts of equity. If, as they have stated, the terms of the deed of foundation be clear and precise in the language, and clear and precise in the application, the course of the court is free from difficulty. If, on the other hand, the terms which are made use of are obscure, doubtful, or equivocal, either in themselves or in the application of them, it then becomes the duty of the court to ascertain by evidence, as well as it is able, what was the intent of the founder of the charity—*in what sense the particular expressions were used.*" Id. 390. "Whenever the words employed," says Mr. Justice Erskine (p. 514), "bear a definite known meaning, no evidence is, in my opinion, admissible to show that the party intended to use them in a more extended or in a more qualified sense." "It is unquestionable," says Mr. Justice Coleridge. (p. 525), "that the object of all exposition of written instruments must be to ascertain the expressed meaning or intention of the writer, the expressed meaning being equivalent to the intention; and I believe the authorities to be numerous and clear (too numerous and clear to make it necessary to cite them) that, where language is used in a deed which, in its primary meaning, is unambiguous, and in which that meaning is not excluded by the context, and is sensible with reference to the extrinsic circumstances in which the writer was placed at the time of writing, such primary meaning must be taken, conclusively, to be that in which the writer used it; such meaning, in that case, exclusively states the writer's intention, and no evidence is receivable to show that, in fact, the writer used it in any other sense, or had any other intention. This rule, as I state it, requires, perhaps, two explanatory observations :

The first, that, if the language be technical or scientific, and it is used in a manner relating to the art or science to which it belongs, its technical or scientific must be considered its primary meaning; the second, that, by 'sensible with reference to the extrinsic circumstances,' is not that the extrinsic circumstances make it more or less reasonable or probable as what the writer should have intended; it is enough if these circumstances do not exclude it—that is, deprive the words of all reasonable application according to such primary meaning. *This rule, thus explained, implies that it is not allowable, in the case supposed, to adduce any evidence, however strong, to prove an unexpressed intention varying from that which the words used import.*" "*I concede,*" he adds (p. 530), "*that, if the evidence were offered for the purpose of introducing words of exclusion, or any words, into the deed not already there, or to raise an inference of intention not expressed, it could not properly have been admitted.*" "The question, then," says Mr. Justice Williams, "resolves itself into this: Whether the deed be expressed in plain, clear, and unambiguous terms. Because if it be, by an undoubted rule of law (if any such there be) too well known to be dwelt upon for a moment—a rule applicable, not to a deed merely, of whatever description, but to every written document—what is written must be expounded by itself." Id. 540. "If," says Baron Gurney (p. 545), "the founder has expressed his or her intention in clear and unambiguous language, there is no necessity for resorting to extrinsic evidence; but, if the language has, by lapse of time and change of circumstances, become obscure, I think that extrinsic evidence may be resorted to." "The intent of the founder," says Baron Parke (p. 555), "is to be ascertained from the meaning of the words in the instrument of foundation alone, with the aid of such extrinsic evidence as the law permits to be used, in order to enable a court to discover the meaning of the terms of any written instrument and to apply them to the facts." "The general rule," says Chief Justice Tindal (p. 665), "I take to be, that,

where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper application of those words to claimants under the instrument, or the subject-matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves ; and that in such case evidence *dehors* the instrument, for the purpose of explaining it *according to the surmised or alleged intention of the parties to the instrument, is utterly inadmissible.* If it were otherwise, no lawyer would be safe in advising upon the construction of a written instrument, nor any party in taking under it ; for the ablest advice might be controlled, and the clearest title undermined, if, at some future period, parol evidence of the particular meaning which the party affixed to his words, or of his secret intention in making the instrument, or of the object he meant to take benefit under it, might be set up to contradict or vary the plain language of the instrument itself." "In no case whatever," he adds (p. 567), "is it permitted to explain the language of a deed by evidence of the private views, the secret intentions, or the known principles of the party to the instrument, whether religious, political, or otherwise, any more than by express parol declarations made by the party himself, which are universally excluded." Mr. Justice Maule thought that none of the evidence offered was admissible (p. 499). Lastly, Lord Cottenham, in moving, as Lord Chancellor, the judgment of the House of Lords, expressly limited the evidence which was admissible to such evidence as bore upon the intention of Lady Hewley, which intention, he says, *"could, after all, only be judged of by the language and terms used in the deeds."*

After this case had been argued in the House of Lords, and before the decisions, Lord Chancellor Sugden, who had argued that case, had occasion to pass upon the same question, in the *Attorney General* v. *Drummond*, 1 Dr. & W. 353. That able and accurate judge laid it down as a rule—

from which he said, emphatically, "I will never depart"—that the extrinsic facts which the court is entitled to know "will only enable the court to put a construction on the instrument consistent with the words," and not to "put a construction on the words which they do not fairly bear" (p. 367). To the same purport is the language of Mr. President Gardner, in *Miller* v. *Gable*, 2 Denio, 492. The language of the conveyance, he held, if clear and unequivocal, is conclusive; if indefinite, extrinsic evidence is admissible in ascertaining the intention.

In *Attorney General* v. *Calvert*, 23 Beav. 258, the master of the rolls declared that the religious opinions of the founder were of paramount importance only in ecclesiastical charities; were wholly to be disregarded in eleemosynary charities; and only of value in educational charities where some directions were given by him on the subject. These practical suggestions were acted upon by the court of errors and appeals of New Jersey, in *Attorney General* v. *Moore*, 4 C. E. Green, 503. And in *Attorney General* v. *Clapham*, 31 Eng. L. & Eq. 164, Lord Cranworth says that parol evidence was received in *Lady Hewley's Case* "only to enable the court to understand and construe the deed under which the trust existed." "For such a purpose," he adds, "the evidence was most reasonable. It was like the evidence afforded by a dictionary which enables us to translate a foreign language, or a book of science which gives us the meaning of words of art."

The language now before us is "for the use of a free public school." The words are plain and unambiguous, convey a definite meaning, and admit of not the least doubt in their application. A free public school for the people of a locality is a school for the public at large of that locality, where the teaching is gratuitous. The words used have precisely the same meaning now as in 1851. There is not the least vagueness or ambiguity, requiring a resort to extrinsic evidence. And all the extrinsic evidence that might be legitimately admissible to enable the court "to

put a construction on the instrument consistent with the words," to use Lord Chancellor Sugden's expression, could not change the construction one particle. Extrinsic evidence, to be of service, must be offered "for the purpose of introducing words of exclusion," or "to raise an inference of intention not expressed," two purposes for which Mr. Justice Coleridge expressly says, and all the other judges say, either expressly or by fair implication, no evidence is properly admissible. And Baron Parke cited with approval a case suggested by Rolfe, the solicitor general, in argument, which is pertinent to the case before us. "A hospital is founded by a physician, with a direction to the trustees to nominate and give salaries to such physicians as they should from time to time think fit; are these medical men to be necessarily such as agree in theoretical opinions with the founder? The answer is not difficult, and it seems clear that these general words must have the same construction, whether the founder were a physician with one class of opinions on medical subjects or another, or, indeed, whether he be a physician or not." The foundation here is for a free school, the details of the management being left to the trustee. Provided the use is within the purpose, the opinions of the founders as to the class of students to be admitted is immaterial.

Whether any of the scholastic population within the limits of South Nashville are excluded from the school by the present arrangement, is a point not raised by the bill. The object of this bill is to correct a supposed omission, or to have a construction of the deed in accordance with that idea. Whenever the free school is so organized as to deprive any of the scholastic population entitled to its benefit of its use, the question would be altogether different.

I am clearly of opinion that the words of this deed admit of no doubt, and that extrinsic evidence to limit, add to, or change them in any particular is wholly inadmissible.

The demurrer must be sustained and the bill dismissed with costs.